J-S16031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.E.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 98 MDA 2025 |

Appeal from the Decree Entered December 19, 2024
In the Court of Common Pleas of York County Orphans' Court at No(s):
2024-0104a

| | | |
|---|---|---|
| IN THE INTEREST OF: G.P.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 99 MDA 2025 |

Appeal from the Decree Entered December 19, 2024
In the Court of Common Pleas of York County Orphans' Court at No(s):
2024-0105a

| | | |
|---|---|---|
| IN THE INTEREST OF: V.M.G., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 100 MDA 2025 |

Appeal from the Decree Entered December 19, 2024
In the Court of Common Pleas of York County Orphans' Court at No(s):
2024-0106a

| | | |
|---|---|---|
| IN THE INTEREST OF: D.M.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |

APPEAL OF: M.B., MOTHER      :
     :
     :
     :
     :
     :    No. 101 MDA 2025

Appeal from the Decree Entered December 19, 2024
In the Court of Common Pleas of York County Orphans' Court at No(s):
2024-0157a

IN THE INTEREST OF: D.B, A MINOR    :    IN THE SUPERIOR COURT OF
     :         PENNSYLVANIA
     :
APPEAL OF: M.B., MOTHER      :
     :
     :
     :
     :
     :    No. 104 MDA 2025

Appeal from the Order Entered December 19, 2024
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000017-2023

IN THE INTEREST OF: G.G., A    :    IN THE SUPERIOR COURT OF
MINOR      :         PENNSYLVANIA
     :
     :
APPEAL OF: M.B., MOTHER      :
     :
     :
     :
     :    No. 105 MDA 2025

Appeal from the Order Entered December 19, 2024
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000018-2023

IN THE INTEREST OF: V.G., A    :    IN THE SUPERIOR COURT OF
MINOR      :         PENNSYLVANIA
     :
     :
APPEAL OF: M.B., MOTHER      :
     :

- 2 -

:
:
:
:    No. 106 MDA 2025

Appeal from the Order Entered December 19, 2024
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000019-2023

| IN THE INTEREST OF: C.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: M.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 107 MDA 2025 |

Appeal from the Order Entered December 19, 2024
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000021-2023

BEFORE:  LAZARUS, P.J., BOWES, J., and LANE, J.

MEMORANDUM BY LANE, J.:          **FILED JUNE 17, 2025**

M.B. ("Mother") appeals from the decrees which involuntarily terminated her parental rights to: her daughter, D.M.B. (born July 2007); her daughter, G.P.G. (born November 2010); her son, V.M.G., Jr. (born October 2011); and her daughter, C.E.G. (born August 2016) (collectively, "the Children").[1] Mother also appeals from the accompanying orders which changed the Children's permanency goals from reunification to adoption.  After careful

---

[1] D.M.B.'s biological father is unknown.  The biological father of G.P.G., V.M.G., Jr., and C.E.G. is V.M.G. ("Father").  By separate decree, the orphans' court terminated the parental rights of Father and any unknown putative fathers.  Neither Father nor any putative fathers appealed from that decree.

- 3 -

review, we affirm the termination decrees and dismiss Mother's appeals from the goal change orders as moot.

The certified record reveals the following relevant factual and procedural history. On January 6, 2023, the York County Office of Children, Youth, and Families ("CYF" or "the Agency") received a Child Protective Services ("CPS") report alleging that Mother's paramour was physically abusing C.E.G. The Agency's investigation and interviews with the Children confirmed the paramour's physical abuse of V.M.G., Jr., and C.E.G. The Agency also discovered that Mother had hit some of the Children with hangers.[2] V.M.G., Jr., indicated that he was fearful of returning home if Mother knew that he had discussed the abuse with anyone, as he had been told that he would be hit again if he made any disclosures. Further, C.E.G. "appeared to minimize the abuse" after Mother spoke to her during a break in an interview and "directed [C.E.G.] to state that the abuse only happened once." Order of Adjudication (C.E.G.), 4/10/23, at 4.

On the same day that the CPS report was received, the Children were removed from Mother's care and placed together in foster care. On January 9, 2023, the court confirmed the Children's removal at a shelter care hearing, wherein Mother acknowledged that she knew that her then-paramour was physically abusing V.M.G., Jr., and C.E.G. and with belts.

_____

[2] The record does not identify which of the Children made these disclosures.

The court adjudicated the Children dependent on April 10, 2023. The court further found that V.M.G., Jr., and C.E.G. were victims of child abuse pursuant to 23 Pa.C.S.A. § 6303. Specifically, Mother was found to be a perpetrator of child abuse as to V.M.G., Jr., and C.E.G. due to her failure to act when she had knowledge of the physical abuse, along with her own actions of striking them with hangers.[3]

The court established the Children's permanency goals as reunification. In furtherance of reunification, the court ordered Mother to, *inter alia*: (1) complete parenting classes; (2) complete a psychological evaluation and follow all recommendations; (3) complete domestic violence treatment; and (4) participate in supervised visitation with the Children. The certified record indicates that between June 22, 2023, and November 25, 2024, Mother made minimal progress with respect to these objectives.

Mother successfully completed a parenting course with Pressley Ridge in July of 2023. *See* N.T., 12/9/24, at 134, 162. Subsequently, Mother participated in similar parenting sessions with Catholic Charities, but was unsuccessfully discharged due to her inability to utilize what was taught in the sessions during her supervised visitations with the Children. *See id*. at 39-40, 42-43, 57, 115-16.

---

[3] The Children have another sibling, E.G., who was born in March of 2015. The certified record reveals that E.G. was also found to be a victim of child abuse pursuant to section 6303, with Mother as the perpetrator for the same reasons as V.M.G., Jr., and C.E.G. *See* N.T., 12/18/24, at 27. E.G. is not subject to this appeal.

In November of 2023, Mother completed a psychological evaluation with licensed psychologist Sandy Pardon, Ph.D. ("Dr. Pardon"), wherein Mother was diagnosed with unspecified bipolar disorder and post-traumatic stress disorder ("PTSD"). *See* CYF Exhibit 6 at 12. The evaluation recommended that Mother participate in outpatient therapy and dialectical behavioral therapy ("DBT").[4] *See id*. In the same month, Mother also completed a domestic violence victim evaluation with Commonwealth Clinical Group. *See* CYF Exhibit 5. This evaluation revealed that Mother suffered from severe anxiety, severe PTSD, and moderate depression. *See id*. at 8-9. The resulting recommendations were, *inter alia*, for Mother to participate in outpatient mental health therapy with a focus on domestic violence psychoeducation. *See id*. at 11. Mother did not consistently participate in any of the recommended therapies and consequently made no appreciable progress with respect to her mental health or domestic violence treatment over the course of the dependency proceedings. *See id*. at 26, 28-29, 34-37, 135-37, 159, 162.

Regarding the Children's mental health, they were engaged in individual therapy throughout the dependencies. *See* N.T., 12/9/24, at 146, 148-50; *see also* Permanency Review Orders. Particularly, V.M.G., Jr., had behavioral concerns which included frequent displays of anger, regressions in maturity,

_____

[4] While DBT is not further defined in the certified record, the evaluation recommended this treatment due to Mother's "mood and behavioral ability[.]" CYF Exhibit 6 at 12. In addition, the goals of DBT for Mother were recommended to be "improving her ability to regulate emotions and behaviors, reducing aggressive behaviors and gestures, and increasing her ability to cope with stressors." *Id*.

and behaviors that were beyond typical reactions for his age. *See* N.T., 12/9/24, at 83, 86, 97, 99, 133.

With respect to supervised visitation, Mother attended the majority of her offered visits, although she consistently arrived late and had periods of repeated cancellations. *See id*. at 40, 60, 63, 102. Catholic Charities provided therapeutic supervised visitation from July until October of 2024.[5] *See id*. at 80-81, 95-96. According to multiple caseworkers, there were ongoing safety concerns with supervised visits, several of which required intervention by staff and security personnel, due to the negative interactions between Mother and V.M.G., Jr. *See id*. at 45-46, 49, 88, 91-92, 128-29. Mother's visitation remained supervised for the entirety of the Children's dependencies. *See id*. at 40, 82, 115.

The Children remained placed together until May 30, 2024. On that date, D.M.B. and V.M.G., Jr., were placed in separate, pre-adoptive foster homes, where they each were living at the time of the termination proceeding. C.E.G. and G.P.G. were placed in their current, pre-adoptive foster home on October 31, 2024, and November 13, 2024, respectively, where they remained together at the time of the subject hearing.

On June 19, 2024, the Agency filed petitions seeking the involuntary termination of Mother's parental rights to G.P.G., V.M.G., Jr., and C.E.G.

---

[5] Alyssa Brown ("Ms. Brown"), a family therapist at Catholic Charities who supervised Mother's therapeutic visits, testified that the therapeutic visits in this case were focused on assessing the Children's behaviors and providing them support in the visits. *See* N.T., 12/9/24, at 98.

pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).  The Agency filed an identical petition with respect to D.M.B. on October 16, 2024.  The Agency simultaneously filed petitions requesting goal changes to adoption for the Children on those same dates.

The orphans' court held combined evidentiary hearings on the Agency's petitions concerning the Children on December 9 and December 18, 2024.[6] CYF presented the testimony of the following witnesses: Dr. Pardon; Ms. Brown; McKenzie Kane (Mother's outpatient psychotherapist from Commonwealth Clinical Group) ("Ms. Kane"); Ashley Howard (Mother's family advocate from Catholic Charities Intensive Family Services) ("Ms. Howard"); and Elyse Nangle (CYF caseworker for the Children) ("Ms. Nangle").  The court admitted several exhibits offered by the Agency.  Mother testified on her own behalf and presented the testimony of Michelle Royer (CYF caseworker for E.G.) ("Ms. Royer"), and the Children's maternal grandmother.

_____

[6] Our Supreme Court has held that appellate courts should engage in *sua sponte* review to determine if the orphans' court has appointed counsel to represent the legal interests of children in contested termination proceedings, in compliance with 23 Pa.C.S.A. § 2313(a).  ***In re Adoption of K.M.G.***, 240 A.3d 1218, 1235 (Pa. 2020).  In this case, the record reflects that the Children's best interests were collectively represented by their guardian *ad litem* ("GAL"), Daniel Worley, Esquire.  The legal interests of seventeen-year-old D.M.G. and thirteen-year-old V.M.G., Jr. were represented by Katherine Doucette, Esquire.  The legal interests of G.P.G., then fourteen years old, were represented by Sherry Myers, Esquire.  Finally, the legal interests of eight-year-old C.E.G. were represented by Andrea Fitzsimons, Esquire.  Thus, as the Children's best and legal interests were represented by separate counsel, the requirements of section 2313(a) were satisfied.

By decrees entered on December 19, 2024, the orphans' court involuntarily terminated Mother's parental rights to the Children pursuant to section 2511(a)(1), (2), (5), (8), and (b). On the same date, the court entered orders changing the Children's permanency goals from reunification to adoption. The court provided its rationale for the decrees and orders on the record in open court at the conclusion of the December 18, 2024 hearing. *See* N.T., 12/18/24, at 17-47.

Mother timely filed separate notices of appeal from the decrees and orders with contemporaneous concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On February 13, 2025, this Court consolidated Mother's appeals *sua sponte*. In its Rule 1925(a) opinion, the orphans' court directed this Court to its stated reasoning on the record at the December 18, 2024 hearing.

Mother presents the following issue for our review:

> Did the [orphans'] court commit an abuse of discretion and error of law in finding that Mother had not alleviated the circumstances necessitating the Children's placement and continued to make substantial progress towards reunification goals when granting the petition for termination of parental rights, and changing the Children's permanency goals[?]

Mother's Brief at 5 (unnecessary capitalization omitted).[7]

---

[7] The Children's GAL joined the Agency's appellate brief in support of affirming the involuntary termination decrees and goal change orders. Legal counsel for C.E.G. submitted a letter requesting this Court to affirm. While legal counsel for D.M.G., G.P.G., and V.M.G., Jr., did not file anything in this Court,
*(Footnote Continued Next Page)*

Our standard of review in this context is well-established:

> In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.
>
> An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.
>
> In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (internal citations and quotation marks omitted).

---

they each advocated for the involuntary termination of Mother's parental rights and the goal change to adoption at the combined hearing. *See* N.T., 12/18/24, at 13-15.

The involuntary termination of parental rights is governed by section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which calls for a bifurcated analysis that first focuses upon the "eleven enumerated grounds" of parental conduct that may warrant termination. *M.E.*, 283 A.3d at 830; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). If the orphans' court determines the petitioner has established grounds for termination under one of these subsections by "clear and convincing evidence," the court then assesses the petition pursuant to section 2511(b), which focuses upon the child's developmental, physical, and emotional needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also* 23 Pa.C.S.A. § 2511(b). This Court need only agree with the orphans' court's determination as to any one subsection of section 2511(a), in addition to section 2511(b), in order to affirm the termination decree. *See M.E.*, 283 A.3d at 830 (*citing In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*)).

Given this latitude, we focus our analysis in this case on section 2511(a)(2)[8] and (b), which provide, as follows:

**(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without

---

[8] By confining our analysis to section 2511(a)(2), we draw no conclusions as to the orphans' court's findings pursuant to sections 2511(a)(1), (5), and (8). *See B.L.W.*, 843 A.2d at 384.

- 11 -

essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \* \*

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

In order to satisfy section 2511(a)(2), the petitioning party must establish: "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Grounds for termination pursuant to section 2511(a)(2), however, "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id*. (*citing In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010)). Overall, we emphasize that "[p]arents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *Id*.

Mother argues that the evidence was insufficient to terminate her parental rights under section 2511(a)(2). *See* Mother's Brief at 37-44. Specifically, Mother asserts that she completed all of her permanency goals. *See id*. at 44. Mother contends that the Agency did not make reasonable efforts to reunify her with the Children and "abdicated" its duties by offering her no assistance or access to services. *Id*. at 41-44. Mother further claims that CYF "clearly believes Mother can parent" E.G., who is not subject to this appeal, because she was going to be permitted to have unsupervised visits with him. *Id*. at 40-41, 44.

The orphans' court considered Mother's challenge to its ruling regarding section 2511(a)(2) and determined that it lacked merit. The court reasoned:

> While the court readily acknowledges that [M]other has engaged with various services throughout the last almost two years, the court has had concerns throughout these past two years regarding [M]other fully accepting that [C.E.G. and V.M.G., Jr.,] were victims of child abuse by her paramour as well as by her own actions and inaction.
>
> * * * *
>
> The court finds that [M]other is not in a position to safely and appropriately manage and properly parent these four children.
>
> * * * *
>
> [M]other has significant progress yet to be made regarding her own mental health which will directly impact her ability to properly engage with and parent her children. Mother also has significant progress to make regarding domestic violence psychoeducation, which is absolutely imperative.

N.T., 12/18/24, at 29, 37, 40-41 (unnecessary capitalization omitted).

Based on our review, we conclude that the record amply supports the orphans' court's findings. Mother's domestic violence evaluation reveals that she reported her former paramour "was the disciplinarian in the household but she felt that it was never to the point of abuse." CYF Exhibit 5 at 4. We emphasize that this evaluation was conducted eleven months after the Children were removed, and seven months after Mother was found to be a perpetrator of child abuse. Despite these findings, Mother still failed to acknowledge the physical abuse suffered by the Children. While Mother testified that she accepted that C.E.G. was a victim of child abuse, the court was within its discretion to find that her testimony was not credible in light of the record evidence. *See* N.T., 12/9/24, at 191; *see also M.E.*, 283 A.3d at 829-30. Further, when questioned by the court at the termination hearing, Mother stated it was the "first time" she heard that V.M.G., Jr., was a child abuse victim, despite being present at the adjudicatory hearing when the underlying finding of abuse was issued. N.T., 12/9/24, at 191-92. Moreover, as discussed *infra*, Mother never completed the resulting recommendations from this evaluation and therefore made no progress toward recognizing and accepting her role in the abuse. *See id*. at 26, 28-29, 34-37, 135-36, 159, 162.

Moreover, notwithstanding Mother's bald claims, the record is clear that she did not complete her required permanency goals. As detailed above, Mother's court-ordered permanency goals included completing parenting

classes, a psychological evaluation and following the resulting recommendations, and domestic violence treatment. In the limited areas of these goals in which Mother did comply, she did not make appreciable progress towards improving her parental capacity.

Ms. Howard, who worked with Mother on parenting sessions at Catholic Charities, testified that they unsuccessfully closed out this service in July of 2024, because Mother did not make any progress in applying what she learned during parenting sessions to her visitations with the Children. *See id*. at 39-40. Ms. Howard further indicated that Mother's supervised visits had not improved since services were opened in January of 2023, and that Mother never demonstrated that she could properly parent without supervision. *See id*. at 40, 42-43.

Ms. Howard identified one of the deficiencies with Mother's parenting abilities as her "communication with the [C]hildren." *Id*. at 42. Ms. Howard testified that Mother had made no progress with the concerns about her parenting, and her communication with the Children had gotten worse over time. *See id*. at 43. With respect to Mother's repeated lack of progress with her parenting skills, Ms. Howard testified on direct examination, as follows:

Q: Did [M]other appear to have those skills or tools to deescalate [V.M.G., Jr.,] or did they kind of feed into each other?

A: No. [Mother] would state oftentimes that she would get triggered by something that [V.M.G., Jr.,] would say and she would lose all composure. She would just play into it. Oftentimes[,] I've had to redirect her to say . . . you just have to ignore him . . . [a]nd she just could not do that regardless

of how many parenting sessions we've talked about it. She would make the statement, I know I have to do better next time. And then next time would come and the same cycle would recur. . . . [O]ftentimes[, Mother] would start first. She would make insults about his speech impediment, how he stutters sometimes. She would often make comments about his clothing or how his intelligence level is not where it should be for his age, which would then set [V.M.G., Jr.,] off into his own rampage and anger.

*Id*. at 45-46.

Further, Ms. Howard, Ms. Brown, and Ms. Nangle testified to the ongoing safety concerns in visits due to Mother's continued inability to parent. *See id*. at 49, 55, 91-92, 128. Ms. Howard testified that, during a supervised visit in May of 2024, an argument between Mother and V.M.G., Jr., "got escalated and it looked as if [Mother] was going to be physically abusive towards [V.M.G., Jr.,] and I had to step in between the two of them[,]" after which Mother continued to intensify the argument. *Id*. at 49, 55. This altercation caused D.M.B. to become upset and lock herself in a bathroom. *See id*. at 55.

Ms. Brown recounted a supervised visit on October 3, 2024, where Mother asked the staff if they were going to intervene when V.M.G., Jr., was escalated, instead of trying to use her parenting skills to resolve the situation herself. *See id*. at 91. In fact, Ms. Brown stated that Mother worsened V.M.G., Jr.'s behavior by continuing to yell at him after the staff had calmed him down. *See id*. at 92. Similarly, Ms. Nangle testified about a supervised visit on October 30, 2024, approximately five weeks prior to the termination

hearing, where Mother instigated an argument with V.M.G., Jr., and encouraged him to initiate a physical altercation between them, and security had to intervene. *See id*. at 128.

Ms. Howard testified that the concerns related to Mother's parenting of C.E.G. were coercion and lack of discipline. *See id*. at 48-50. Ms. Howard recounted that Mother would use "manipulation tactics" with C.E.G., such as telling her CYF is keeping them apart "for no reason" and repeatedly requesting that C.E.G. tell the judge she wanted to go home. *Id*. at 49-50. Ms. Howard stated that she had multiple conversations with Mother about properly disciplining and redirecting C.E.G., but Mother reported that "she can't find herself to do it." *Id*. at 48. Ms. Brown and Ms. Nangle corroborated these concerns. *See id*. at 92, 127, 131.

In addition, Ms. Howard testified that the Children were all negatively affected by Mother's inability to parent when one of them triggered Mother. *See id*. at 55. Ms. Howard stated that D.M.B. and G.P.G. would consciously censor their conversations with Mother and keep them "surface level" so they would not trigger Mother if they said the wrong things. *Id*. at 43-44. Moreover, Ms. Brown and Ms. Nangle testified that G.P.G. would step into the parental role during the arguments between Mother and V.M.G., Jr. *See id*. at 94, 157. The foregoing evidence, most concerningly the testimony that Mother continued to show a proclivity towards physical abuse even while

supervised, clearly demonstrates that Mother had a repeated and continued inability to parent the Children at the time of the termination proceeding.

Regarding Mother's mental health, Ms. Kane testified that she began weekly outpatient therapy with Mother in January of 2024. *See* N.T., 12/9/24, at 26. However, Ms. Kane reported that Mother had issues with consistency and missed eleven appointments since May of 2024. *See id*. at 26, 28, 34-35. After approximately one year of treatment, Ms. Kane rated Mother's progress as "fair" due to her inconsistent attendance. *Id*. at 30. Ms. Nangle testified that the Agency received no documentation that Mother made any appreciable progress with her multiple mental health diagnoses. *See id*. at 135-37. While Ms. Nangle stated that Mother engaged with the required DBT for an undisclosed period of time, there is no record evidence that she successfully completed the therapy and Mother testified that she did not meet her goals during the sessions. *See id*. at 137, 162, 182. Notably, the record is devoid of evidence that Mother made any progress in regard to her specific triggers which directly affect her lack of parenting ability and Ms. Nangle testified that Mother made no progress with her coping skills. *See id*. at 159, 162.

With respect to domestic violence, Mother acknowledged that she did not complete this goal, which Ms. Kane corroborated. *See* N.T., 12/9/24, at 28, 187. Ms. Kane stated that she and Mother touched on some domestic violence topics in their sessions prior to March of 2024. *See id*. at 34-35, 37.

Nevertheless, Ms. Kane reported that Mother's unstable mental health prevented her from moving forward with the domestic violence education because mental health treatment took precedence in their sessions. ***See id***. at 36. Ms. Kane stated that if Mother had completed the domestic violence education, then Ms. Kane would have "a better understanding of where [Mother]'s at in terms of recognizing signs of abuse and regulating her own emotions regarding her own participation" in the abuse the Children suffered. ***Id***. at 31.

To the extent that Mother argues that the Agency failed to provide her reasonable efforts, this argument must fail because it lacks factual and legal merit. Every court order from the Children's dependencies over the course of almost two years found that Mother was provided with reasonable efforts by CYF to reunify with the Children. ***See generally*** Permanency Review Orders. Ms. Nangle testified that CYF provided Mother with a plethora of services, and that Mother did not request any service that was not provided. ***See*** N.T., 12/9/24, at 134, 150. Mother's failure to effectively utilize the services offered to make the required progress to achieve reunification does not amount to a lack of reasonable efforts on behalf of the Agency. Further, our Supreme Court has stated that an orphans' court is not required "to consider the reasonable efforts provided to a parent prior to termination of parental rights."

*In re D.C.D.*, 105 A.3d 662, 672 (Pa. 2014).[9]  Therefore, Mother's argument

merits no relief.

Furthermore, Mother's argument as to E.G., who is not subject to this

appeal, is unavailing.  Our Supreme Court has established that:

> [T]rial courts in termination cases should utilize the established relevancy test on a case-by-case basis when asked to assess the admissibility of evidence related to a parent's ability to care for a child other than the child who is subject to the termination proceeding.  If the trial court deems the evidence to be relevant, then the evidence should be admitted into the record and the court, as fact-finder, should assign that evidence the appropriate weight to which it is entitled in reaching its factual and legal conclusions.

*In re Interest of S.K.L.R.*, 256 A.3d 1108, 1124 (Pa. 2021).

Here, the orphans' court heard testimony from the CYF caseworker

assigned to E.G.'s case, Ms. Royer.  *See* N.T., 12/9/24, at 69-77.  Ms. Royer

testified that she had never had the opportunity to observe a situation where

Mother was triggered by E.G.  *See id*. at 73.  Therefore, she had no knowledge

of how Mother would handle such a situation.  Further, Ms. Royer testified that

unsupervised visitation with E.G. had not yet begun, so she did not provide

any information as to their quality.  *See id*. at 71.  Our review of Ms. Royer's

testimony does not establish that CYF believed Mother could effectively parent

---

[9] Mother points out that **D.C.D.** states that lack of reasonable efforts may be relevant to whether a parent cannot or will not remedy their incapacities in a section 2511(a)(2) analysis.  **See** Mother's Brief at 42.  However, as Mother was consistently provided with reasonable efforts, her reliance on **D.C.D.** is unavailing.

E.G., as Mother contends. Moreover, as indicated above, the certified record reveals that E.G. was also found to be a victim of child abuse pursuant to section 6303, with Mother as the perpetrator for the same reasons as V.M.G., Jr., and C.E.G. *See* N.T., 12/18/24, at 27. Consequently, the orphans' court was within its discretion to consider the evidence as to E.G.'s dependency, and either assign it appropriate weight or entirely reject it before ultimately reaching its factual and legal conclusions that termination of Mother's parental rights was warranted as to the Children. *See S.K.L.R.*, 256 A.3d at 1124; *see also* N.T., 12/9/24, at 70 (the orphans' court overruling CYF's objection on the basis of relevancy regarding the testimony of Ms. Royer, and stating it will "weigh the testimony appropriately based on the matter before the [c]ourt regarding [M]other's four children other than [E.G.]").

The foregoing record evidence demonstrates that Mother's repeated and continued incapacities with respect to her inclination for physical abuse, her inability to effectively parent, her unresolved mental health concerns, and her failure to complete domestic violence education, have caused the Children to be without essential parental care, control, or subsistence. *See A.H.*, 247 A.3d at 443. Further, the record undoubtedly supports a determination that Mother's incapacities cannot or will not be remedied, as she has not successfully remedied them after twenty-three months of CYF assistance and services. *See id*. Therefore, we discern no abuse of discretion by the orphans'

court in reaching its determination that termination of Mother's parental rights was warranted pursuant to section 2511(a)(2).

Having concluded that adequate grounds for termination existed pursuant to section 2511(a), the orphans' court then determined that CYS had established that termination was in the Children's best interests pursuant to section 2511(b). **See** 23 Pa.C.S.A. § 2511(b); **see also T.S.M.**, 71 A.3d at 267. However, Mother did not preserve any challenge to the orphans' court's rulings regarding section 2511(b). In her concise statements, Mother raised two issues pertaining to section 2511(a), and did not include any issue regarding section 2511(b). **See** Mother's Concise Statements. We have long ruled that issues not included in the concise statement are waived. **See** Pa.R.A.P. 1925(b)(4)(vii); **see also** Pa.R.A.P. 302(a) (providing that issues not raised in the trial court are waived and cannot be raised for the first time on appeal). Accordingly, we conclude that Mother has waived any challenge to the orphans' court's findings pursuant to section 2511(b).[10]

_____

[10] We further observe that, in her appellate brief, Mother did not raise any challenge relating to section 2511(b) in her statement of questions involved, as detailed **supra**. **See** Pa.R.A.P. 2116(a) (providing that no question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby); **see also In re M.Z.T.M.W.**, 163 A.3d 462, 466 (Pa. Super. 2017) (reiterating that issues not included in statement of questions involved are subject to mandatory waiver). In addition, Mother fails to present any argument concerning section 2511(b) in her brief. Instead, the entirety of Mother's brief consists of her argument that she remedied the conditions of the Children's removal, which is relevant only to section 2511(a). **See id**. Thus, any purported challenge to section 2511(b) would have been further

*(Footnote Continued Next Page)*

We next turn to Mother's challenge to the orders that changed the Children's permanency goals to adoption. Given our disposition of her appeal from the termination decrees, we conclude that her goal change appeal is moot. *See Interest of A.R.*, 311 A.3d 1105, 1114 (Pa. Super. 2023) (holding that the affirmance of termination of parental rights renders an appeal of the goal change to adoption moot). Thus, we dismiss the appeals of the goal change orders as moot.[11]

In sum, we affirm the decrees with respect to the involuntarily termination of Mother's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b). We dismiss the appeals from the goal change orders as moot.

Decrees affirmed. Appeals from goal change orders dismissed as moot.

---

waived for lack of development in the brief. *See Lackner v. Glosser*, 892 A.2d 21, 29 (Pa. Super. 2006).

[11] Even if not moot, we would conclude that Mother has waived any challenge regarding the goal change orders. Mother makes no mention of and advances no arguments regarding the goal change orders in the argument section of her brief. Therefore, any claim regarding the goal change orders is waived due to her failure to develop it. *See Lackner*, 892 A.2d at 29.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 06/17/2025